UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------x
EDWARD J. BAKER,

           Plaintiff,

-against-

POREX CORPORATION & STRYKER
CORPORATION,

           Defendants.
------------------------------------------------------------x

NOT FOR PUBLICATION
**MEMORANDUM & ORDER**
16-CV-3422 (CBA) (LB)

**AMON, United States District Judge:**

Plaintiff Edward Baker ("Baker") brings this action against Porex Corporation ("Porex") and Stryker Corporation ("Stryker"), alleging claims for strict liability, negligence, and breach of warranty under New York law to recover for an ill-fitting implant in his jawline. (D.E. # 1 ("Compl.").) Presently before the Court is defendants' motion for summary judgment on the grounds that Bakers' claims are time-barred. (See D.E. # 32 ("Defs. Mem.").) For the reasons set forth below, defendants' motion is granted.

## BACKGROUND[1]

The parties generally agree on the timeline of events leading up to this dispute. To the extent they disagree about specifics, those disagreements, where relevant, are noted below. During the past seventeen years, Baker has had nearly a dozen surgeries aimed at correcting his micrognathia and microgenia, conditions that purportedly left him with an undersized jaw and chin. (Defs. 56.1 ¶¶ 4–9.) In 2002, Baker initiated the medical process that would ultimately lead to this action. He had his first set of jawbone implants inserted bilaterally along his mandible.

---

[1] The following facts are drawn from defendants' Rule 56.1 Statement (D.E. # 33 ("Defs. 56.1")), defendants' exhibits submitted in support of their motion, (D.E. # 37 ("Defs. Exs." B–E, G–L)), the transcript of Baker's deposition taken on January 1, 2014 in the Baker v. Zide action, (D.E. # 37-Ex. A ("Baker Dep. I")), the transcript of Baker's deposition taken on March 7, 2014 in the Baker v. Zide action, (D.E. # 37-Ex. F ("Baker Dep. II")), and the affidavit and exhibits submitted by Baker in opposition to defendants' motion, (D.E. # 38 ("Baker Aff.")).

1

(Baker Dep. I at 56:10–57:2.) According to Baker, those angle implants were "standard off the shelf implants." (Id.) Apparently dissatisfied with the generic nature of those implants, Baker consulted with Dr. Oscar Ramirez to explore whether he could replace them with custom made ones. (Baker Dep. I at 64:12–21, 68:12–69:24.) Dr. Ramirez thereafter inserted two custom angle implants on April 11, 2005. (Id.) Baker also had a custom-made chin implant placed during this surgery. (Id.) Eventually, Baker began to think his right angle implant was "skewed" in its placement and he began planning to have that implant replaced, along with his left one, which had since become infected. (Id. at 73:15–18, 83:15–19.) Dr. Ramirez performed the surgery on August 22, 2006, in Maryland, taking out the other implants and inserting two new customized implants. (Defs 56.1 ¶ 8.) Porex manufactured the right angle implant used in Baker's 2006 surgery. (Id.)

In addition to inserting the customized implants, Dr. Ramirez completed a series of other procedures. (Defs. 56.1 ¶ 9; Baker Aff. at ¶ 25.) Those procedures included a neck lift, placement of a Giampappa suture sling, liposuction of his neck, a transected platysma, and an ear lobe reduction. (Defs. 56.1 ¶ 8–10; Baker Aff. at ¶ 30.)

### A. Baker Feels Pain and a Choking Sensation "Immediately" After His August, 22 2006 Surgery

Baker experienced a choking sensation "right off the bat" after the 2006 surgery. (Defs 56.1 ¶ 11; Baker Dep. I at 86:14–87:4.) He described the symptoms as a "pressure right above the Adam's apple" that also "radiated forward to the interior of [his] chin." (Baker Dep. I at 89:16–90:2.) In a follow-up visit with Dr. Ramirez three days after the surgery, Baker expressed concern about his pain and discomfort, stating that "it wasn't normal." (Id. at 100:11–17.) When the numbness receded about three months after his surgery, (id. at 87:16–88:5), Baker felt the choking sensation even more intensely: "The more the numbness wore off, the more choking sensation [he] experienced." (Id. at 88:6–12; Defs 56.1 at ¶ 14.) As a result of that choking sensation, Baker

found that "just laying on one side would cause [his] whole ear area to become painful." (Baker Dep. I at 126:6–17.)

Baker described his pain as "radically different" from the pain that he experienced following his two prior mandible implant surgeries. (Id. at 89:1–12.) Baker also consistently complained about this same pain from that point until he had the implant surgically removed on May 31, 2013. (Baker Dep. II at 274:18–276:3). He avers that his pain was so acute that he had almost seven years of nightmares relating to the pain and choking. (Baker Aff. at ¶ 32.)

### B. Baker Sought Numerous Consultations to Alleviate His Pain

Beginning with follow-up visits with Dr. Ramirez in 2006, Baker consulted numerous other doctors to address his pain and choking sensation over the years. Generally, the doctors offered varying hypotheses as to the source of Baker's symptoms and conducted procedures that ultimately proved unsuccessful in relieving his symptoms, until Dr. Kenneth Francis finally removed the defective right angle implant on May 31, 2013. (Defs 56.1 ¶ 69–70; Baker Aff. at ¶ 4.) At several points before the removal of his right angle implant, however, either a doctor or Baker himself affirmatively raised the possibility that the right angle implant inserted by Dr. Ramirez was causing his discomfort and pain. Those consultations are described in more detail below.

Baker made approximately six post-operative visits to Dr. Ramirez, (Baker Dep. I at 107:16–19), where they discussed his pain and choking sensation, (id. at 105:12–15). Eventually, Dr. Ramirez came to believe that the suture sling was the root of Baker's pain. (Id. at 105:16–25.) After that opinion, Baker lost confidence in Dr. Ramirez and he sought out Dr. Michael Yaremchuk in May 2008. (Id. at 107:4–15; Defs 56.1 ¶ 24.) The parties dispute some of the contents of Baker's conversations with Dr. Yaremchuk, but Baker testified that Dr. Yaremchuk advised him "[t]o remove all the implants," (Baker Dep. I at 108:12–19), that they should try to find and remove

the suture sling, (id. at 110:23–111:9), and that Dr. Yaremchuk "wonder[ed] [if] the right implant was flush or misplaced," (Baker Aff. at ¶ 42). Ultimately, however, Dr. Yaremchuk declined to remove Baker's implants because of Baker's history of post-operative infections. (Yaremchuk Aff. at ¶ 21.) Baker also testified that Dr. Yaremchuk observed that the right angle implant had an "extremely excessive overlap on the interior surface." (Baker Dep. I at 174:6–14.)

In the fall of 2008, Baker consulted with Dr. Francis about his symptoms. (Baker Aff. at ¶ 44.) They discussed many causal theories and Baker "expressed wonder whether the angle implants were not flush against the bone." (Id.) Baker advised Dr. Francis that he "believed" that his "mandibular angle implants are posteriorly displaced and causing his regular pain complaints." (Defs. Ex. C at 16.) Dr. Francis continued treating Baker throughout 2008 and 2009, and, at each visit, he continued to report ongoing pain and choking sensation. (Id. at 16–18.) He also reported that these symptoms prevented him from getting a full night's sleep. (Id.) After several neurology treatments, Baker returned to Dr. Francis for a minor operation on November 9, 2009, which did not relieve Baker's pain or choking sensation. (Baker Dep. I at 111:21–112:10; Baker Aff. at ¶¶ 46–47.)

Baker then met with Dr. Barry Zide in January 2010, seeking "relief from the tightness and choking." (Baker Dep. I at 131:8–18.) Before the consultation, Baker emailed Dr. Zide and explained that he "immediately" felt pain and the choking sensation following the 2006 implant surgery, and that he was convinced that his implants were "badly placed." (Id. at 133:5–134:7.) Baker stated that he "was inclined to consider that the implant was not flushed against the bone." (Id. at 134:25–136:15.) Dr. Zide's ensuing surgery, aimed at adjusting Baker's Adam's apple, ultimately proved ineffective. (Defs. Ex. H.) In fact, Baker's symptoms of pain, tightness and choking became even more pronounced following that surgery. (Defs. Ex. H at 86–88.) Baker's

4

relationship with Dr. Zide thereafter soured, and he sued him for medical malpractice, alleging that the surgery Dr. Zide performed exacerbated his "painful condition." (Defs. Ex. I.)

After that, Baker consulted with a series of other doctors, including Drs. Vincent Giampappa, Stephen Warren, John Delfino, Brent Moelleken, and William Rosenblatt between July 2010 and June 2011. (Baker Aff. at ¶ 53–57.) The customized angle implant and the possibility that it was misshapen or otherwise defective were never far from Baker's mind during those visits. Indeed, Baker acknowledges that he "might have" provided Dr. Warren with a letter to send to Stryker requesting information about the design of the implants. (Baker Dep. II at 240:16–19.)

In July 2011, Baker returned to Dr. Yaremchuk for at least two more examinations. (Baker Aff. at ¶¶ 58–67.) Again, the parties dispute the contents of these visits. For his part, Baker avers that Dr. Yaremchuk "recognized that there could be numerous factors to account for [Baker's] condition." (Id. at ¶ 32.) Dr. Yaremchuk testified that Baker complained of the pain and choking sensation, which Dr. Yaremchuk thought might be caused by a repositioning of Baker's digastric muscles. (Yaremchuk Aff. at ¶ 66.) When Baker returned to Dr. Yaremchuk in January 2012, Baker requested that he remove his bilateral angle implants, but Dr. Yaremchuk declined to operate. (Id. at ¶ 66.)

In 2012, Baker then consulted Dr. George Yang. Dr. Yang found and removed the sling from his 2006 surgery, but Baker's pain continued. (Id. at ¶¶ 75–76; Baker Dep. I at 126:18–24.) Baker acknowledges that he asked Dr. Yang to inspect the angle implants, (Baker Aff. at ¶ 39), but Dr. Yang declined to do so because of his inexperience with implants, (Defs. Ex. K at 8). Ultimately, Dr. Yang recommended that Baker see Dr. Francis to have his implants removed. (Defs. Ex. K at 16.)

Baker followed that advice. On April 18, 2013, Baker instructed Dr. Francis to remove his customized right angle implant to alleviate his pain and choking sensation. (Defs. Ex. C at 24.) It was not until after that surgery, which Dr. Francis performed in Maryland on May 31, 2013, that his pain mostly subsided. (Defs 56.1 ¶¶ 69–70; Baker Aff. at ¶ 4.)

On May 20, 2016—nearly ten years after the angle implants were installed, Baker filed the instant action against Stryker. (D.E. # 1 ("Compl.").) The Complaint alleges that "[t]he Porex/Stryker design was the sole cause of the damages to Plaintiff, and it impinged Baker's neck and jaw muscles in such a manner as to cause six years of intense pain with frequent choking sensations." (Id. at ¶ 1.) The Complaint further alleges that "[f]or seven years, the plaintiff did not have a good night's sleep, and he experienced hundreds of nights with dreams of being choked to death." (Id.) Based on these allegations, the Complaint asserts claims for "strict liability, breach of implied warranty and clear negligence and recklessness." (Id. at ¶ 10.)

Given the near decade long gap between Baker's surgery and his filing of the instant complaint, defendants requested that discovery be bifurcated to focus first on the question of whether Baker's claims are timely. (D.E. # 21.) Based upon that discovery, defendants moved for summary judgment on the grounds that each of Baker's claims are barred by New York's statute of limitations.

## STANDARD OF REVIEW

Summary judgment is appropriate when the movant shows that there is "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). This Court's function is not to resolve disputed issues of fact but rather "to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.

The moving party carries the initial burden of demonstrating the absence of a material factual question. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In determining whether this initial burden has been satisfied, a court must "construe the facts in the light most favorable to the nonmoving party and . . . resolve all ambiguities and draw all reasonable inferences against the movant." Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011) (internal quotation marks and citation omitted). Nevertheless, the nonmoving party cannot rest on speculations, conjecture or denials but "must set forth specific facts showing that there is a genuine issue for trial." Rubens v. Mason, 527 F.3d 252, 254 (2d Cir. 2008) (internal quotation marks and citation omitted). A genuine issue exists only where "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." Anderson, 477 U.S. at 249. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249–50 (citations omitted).

## DISCUSSION

### I. Statute of Limitations

Baker argues that Maryland's statute of limitations applies to each of his claims because his August 22, 2006, surgery was performed in Maryland. (Baker Aff. at ¶ 1.) Defendants, by contrast, contend that New York's statute of limitations applies because Baker is a resident of New York. (D.E. # 39 ("Defs. Reply") at 3.) Because jurisdiction in this case is premised upon diversity of citizenship, the Court applies New York's choice of law rules and statutes of limitations. See Stuart v. American Cyanamid Co., 158 F.3d 622, 626 (2d Cir. 1998) ("Where jurisdiction rests upon diversity of citizenship, a federal court sitting in New York must apply the New York choice-of-law rules and statutes of limitations."); see also Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 433 (2d Cir. 2012) (same); Cantor Fitzgerald Inc. v. Lutnick, 313

F.3d 704, 709 (2d Cir. 2002) ("[I]t is well established that in diversity cases[,] state law governs not only the limitations period but also the commencement of the limitations period . . . [t]o determine which state's law applies, a federal court sitting in diversity must apply the conflict-of-laws rules of the state in which the federal court sits.")

"New York courts generally apply New York's statutes of limitations, even when the injury giving rise to the action occurred outside New York." Stuart, 158 F.3d at 627. "This general rule, however, is subject to . . . New York's 'borrowing' statute, [N.Y.] CPLR § 202," which in some circumstances can lead to the application of another state's statute of limitations. Id. "However, plaintiffs who are residents of the State of New York are 'affected only by the New York limitations period" and the borrowing statute has no relevance. Landow v. Wachovia Secs., LLC, 966 F. Supp. 2d 106, 120 (E.D.N.Y. 2013) (quoting Braniff Airways, Inc. v. Curtiss-Wright Corp., 424 F.2d 427, 428 (2d Cir. 1970)); see also Gluck v. Amicor, Inc., 487 F. Supp. 608, 612 (S.D.N.Y. 1980) ("The borrowing statute is applicable to suits brought in New York by nonresidents on causes of action accruing outside the state."). Accordingly, "New York State residents are 'always subject to the New York statute of limitations.'" Kilmer v. Flocar, Inc., 212 F.R.D. 66, 70 (N.D.N.Y. 2002); see also Thea v. Kleinhandler, 807 F.3d 492, 497 (2d Cir. 2015) (stating that New York's statute of limitations applies to New York residents).

Here, Baker is and has been domiciled in New York since at least his August 22, 2006 surgery. As such, his claims are governed by New York's statute of limitations. See Landow, 966 F. Supp. 2d at 120; Lia v. Saporito, 909 F. Supp. 2d 149, 162 (E.D.N.Y. 2012), aff'd, 541 F. App'x 71 (2d Cir. 2013) ("Since the [plaintiffs] are all residents of the State of New York, New York's statutes of limitations apply."). Application of New York's statute of limitations to Baker's three claims is discussed below, beginning with his two claims sounding in tort.

## A. Negligence and Strict Liability

Claims for negligence and strict liability are subject to the ordinary statute of limitations for personal injury actions. See N.Y. CPLR § 214(5). "For [medical] implants the time period is three years from the date of injury resulting from malfunction, not from the date of implantation of the device—unless implantation and malfunction occur at the same time." Guisto v. Stryker Corp., 293 F.R.D. 132, 135 (E.D.N.Y. 2013) (citing Martin v. Edwards Labs., Div. of Am. Hosp. Supply Corp., 469 N.Y.S. 2d 923 (1983) ("The Statute of Limitations for personal injury caused by the malfunctioning of a prosthetic or contraceptive device implanted or inserted into the human body runs from the date of the injury resulting from the malfunction, not necessarily from the date of implantation or insertion."), superseded by statute only as to toxic tort claims, CPLR § 214–c, as recognized in Desieno v. Crane Mfg. & Serv. Corp., 127 F. App'x 551 (2d Cir. 2005).

"If 'the onset of the process traceable to the device, which is claimed to have caused plaintiff's injury, began more than three years before the commencement of the action, the defendant will be entitled to dismissal of the entire complaint on Statute of Limitations grounds.'" Id. (quoting Fitzpatrick v. A.H. Robins Co., Inc., 99 A.D.2d 478, 479 (2d Dep't 1984)). "A cause of action accrues for purposes of CPLR 214 'when all of the facts necessary to the cause of action have occurred so that the party would be entitled to obtain relief in court." Blanco v. Am. Tel. & Tel. Co., 90 N.Y.2d 757, 767 (1997) (quoting Aetna Life & Cas. Co. v. Nelson, 501 N.Y.S.2d 313, 492 (1988)).

Here, Baker alleges that his right angle implant's "sole" malfunction was an "obvious flaw" in its design. (Compl. ¶ 7.) Specifically, Baker contends that the "sole" flaw was that the implant was so ill fitting that it impinged on his other facial muscles, causing pain and a choking sensation. (Baker Dep. II at 173:15–176:10.) Baker began this action on May 20, 2016 when he filed his

9

complaint against defendants in state court. (D.E. #1-Ex. A.) For Baker's negligence and strict liability claims to be timely under New York's three-year statute of limitations, he must have experienced an injury caused by the claimed defect no earlier than May 20, 2013. See Guisto, 293 F.R.D. at 136 ("If [plaintiff] is able to avoid the applicable three-year statute, any of the continuous pain, [plaintiff] felt before this cutoff date could not have been caused by, or traceable to . . . the claimed defect.").

On the undisputed facts, Baker cannot satisfy that standard. He claims that the "sole" flaw in the implant led to pain immediately after it was implanted, (Baker Dep. I at 100:7–20), that his pain was "radically different" from pain that he experienced after his prior implant surgery, (id. at 88:6–12), and that he consistently complained about this same pain from that point forward until he had the implant surgically removed in May 2013, (Baker Dep. II at 274:18–276:3). Baker stated that he was in communication with his surgeon, Dr. Ramirez, within three days after the surgery, complaining of the same tightness and choking sensation that he would experience for the next seven years until he had the implant removed. (Baker Dep. I at 88:6–87:4; 88:7.) He complained of these same symptoms to Dr. Ramirez in 2006, Dr. Francis in 2007, 2008, 2009 and 2010, (Defs. Ex. C), twice to Dr. Yaremchuck in 2008, (Baker Dep. II at 174:6–14, Yaremchuk Aff. at ¶¶ 21–22), Dr. Zide in 2010, (Baker Dep. II at 186:20–187:4, Defs. Ex. H, Baker Dep. I at 131–136), Dr. Warren in 2011, (Baker Dep. II at 240:14–241:7), and Dr. Yang in 2012, (id. at 274:18–7). The record is replete with many instances of both Baker complaining about the same tightness and choking sensation following his 2006 surgery as well as articulating his suspicion that those conditions were being caused by the right angle implant. As just one example, in 2011, he urged Dr. Warren to write to Stryker to discuss the design of his implant, (Baker Dep. II at

240:14–241:7), an unmistakable sign that Baker suspected that the flawed design was causing his symptoms.

In opposition, Baker does nothing to dispel this clear pattern of his complaining of a new, "radically" different pain "immediately" after his 2006 implant surgery and continuing until it was removed. Instead, he confirms it to be the case. For example, he avers that "the damage started to become manifest in relative short order" and "[t]his is not a case of a prosthetic failing over time with normal deterioration," (Baker Aff. at ¶ 4), because "tightness at the Adam's apple was immediately sensed," (id. ¶ 24). He also testifies that Dr. Yaremchuk "wondered if the angle implant was flush or malplaced" in 2008, (id. ¶ 42), and he expressed that same concern to Dr. Francis later that year, (id. ¶ 44). Given these facts, no reasonable jury could find that Baker did not experience pain traceable to the alleged design flaw before the statute of limitation expired on May 20, 2013. See Guisto, 293 F.R.D. at 137 (granting summary judgment based upon New York's statute of limitations where plaintiff, who claimed a hip replacement was defective "immediately" upon its placement, "visited multiple specialists about worsening pain in and around her left hip; at least one of her doctors expressed repeated concerns about potential loosening of the cup; and she requested revision surgery on more than one occasion . . . long before the cut-off date"); see also Galletta v. Stryker Corp., 283 F. Supp. 2d 914, 917 (S.D.N.Y. 2003) (finding claims time barred where plaintiff experienced pain resulting from a defective implant more than three years before commencing his action).

Baker's argument that his claim is timely because he discovered that the implant was the true cause of his pain and choking sensation only when the implant was removed on May 31, 2013, is of no moment. It is well settled that "'discovery of the physical condition and not . . . the more complex concept of discovery of both the condition and the nonorganic etiology of that condition'"

11

starts the clock on the statute of limitations. See Ferreri v. McGhan Med. Corp., No. 95-CV-6189 (RPP), 1997 WL 580714, at *3 (S.D.N.Y. Sept. 17, 1997) (quoting Wetherill v. Eli Lilly & Co., 655 N.Y.S.2d 862, 866 (1997). Therefore, Baker's allegation that he only discovered that the implant's design was the source of his pain in May 2013 when it was removed is immaterial; he was aware of the pain that flowed from its design flaw for nearly seven years before that. See Guisto, 293 F.R.D. at 137 ("The allegation that plaintiffs only learned of the device's lack of ingrowth and fixation in March 2011 is immaterial; they were aware of the pain that flowed, allegedly, from the defect even if they did not know its source."); see also Wetherill, 655 N.Y.S.2d at 866 (stating that if the law were more based on plaintiff's discovery of correct diagnosis, "the date for commencing an action under [CPLR § 214] would depend on such fortuitous circumstances as the medical sophistication of the individual plaintiff and the diagnostic acuity of his or her chosen physician"); Galletta, 283 F. Supp. 2d at 917 ("The three year limitations period runs from the date when plaintiff first noticed symptoms, rather than when a physician first diagnosed those symptoms."). Accordingly, that Baker could not conclusively rule out all other potential causes of his pain until he had the implant removed is insufficient to avoid CPLR § 214(5)'s three year statute of limitations. Baker's discovery of his symptoms immediately after his August 22, 2006 surgery and those symptoms' persistence for approximately six years thereafter serve as insuperable bars to his ability to press his claims now.

Defendants address the toxic torts exception to CPLR § 214 at some length in their brief. (See Defs. Mem. at 13–19.) The toxic torts exception can toll the statute of limitations where the injury arises from the "latent effects of exposure to any substance or combination of substances" within three years of "date of discovery of the injury by the plaintiff or from the date when, through the exercise of reasonable diligence, such injury should have been discovered by the plaintiff,

12

whichever is earlier." N.Y. CPLR § 214–c. The toxic torts exception does not apply to this case and even if it did, it is of no help to Baker. The exception is inapplicable to this case because it only "covers exposure to toxic substances from implantation of the substance." Guisto, 293 F.R.D. at 137. Baker does not contend that he was exposed to a toxic substance or latent disease from the implant. See Giordano v. Market Am. Inc., 915 N.Y.S.2d 884 (N.Y. 2010) (stating that "the whole point of CPLR 214–c was to deal with substance exposure cases"). Nor does he contend that he developed a condition or contracted a disease because of his implant. See Guisto, 293 F.R.D. at 137 (finding personal injury claims barred where plaintiffs "made no allegations of developing any condition or contracting any disease because of the device"); see also Blanco, 90 N.Y.2d at 766–67. Instead, Baker alleges and the evidence shows that the implant was ill-fitting and caused his injury the day it was implanted. (See, e.g., Baker Aff. at ¶ 4.) Thus, the toxic tort exception to the CPLR's usual three year statute of limitation has no applicability to this case.

Even if the toxic torts exception applied, Baker's claims would still be time-barred. As is the case with CPLR § 214(5), CPLR § 214–c's clock starts when the plaintiff discovers his injury, Cerqua v. Stryker Corp., No. 11-CV-9208 (KBF), 2012 WL 5506119, at *3 (S.D.N.Y. Nov. 9, 2012), not when he receives the correct diagnosis, Gaillard v. Bayer Corp., 986 F. Supp. 2d 241, 247 (E.D.N.Y. 2013) ("Thus, a non-diagnosis or misdiagnosis of the symptoms . . . does not alter the rule that the claims began to run under Section 214–c(2) at the time plaintiff noticed her symptoms in 2005 . . . .") (internal citations and quotations omitted)). As explained above, no genuine issue of material fact remains on the issue of whether Baker discovered that his symptoms traceable to the ill-fitting implant before the statute of limitations expired; indeed Baker's affidavit confirms that he discovered those symptoms ten years before he commenced this action. Accordingly, the Court grants summary judgment on Baker's negligence and strict liability claims.

13

## B. Breach of Warranty

Warranties in the product liability context are subject to a four-year limitation from tender of delivery. NY UCC § 2–725(1)–(2). "It is well settled that the statute of limitations applicable to a breach of warranty claim, whether express or implied, begins to run at the time the product is placed in the stream of commerce or at the time of sale by the manufacturer." Schrader v. Sunnyside Corp., 747 N.Y.S.2d 26, 28 (2d Dep't 2002) (collecting cases). In the context of medical implants, tender of delivery occurs no later than the date the device is implanted. See Guisto, 293 F.R.D. at 139 ("Plaintiffs' implied warranty claims expired in 2010—four years from the tender of delivery, or when Mrs. Guisto received the device. The express warranty claims expired then as well."); see also Gelber, 788 F. Supp. 2d at 166; Galletta, 283 F. Supp. 2d at 916 (stating that "[t]here is no question that the breach of warranty claim is time barred" where the lawsuit was not commenced until more than four years after the date of the operation inserting the polyethylene implants).

Baker's breach of warranty claim is clearly time-barred. It is undisputed the implants were inserted Baker on August 22, 2006, and he experienced symptoms immediately thereafter. Accordingly, in order to be timely, Baker should have filed his claims by August 22, 2010. Instead, he waited almost six years later. Consequently, the Court grants summary judgment on Baker's breach of warranty claims.

## CONCLUSION

For these reasons, the Court grants defendants' motion for summary judgment. The Clerk of Court is directed to enter judgment accordingly.

SO ORDERED.

Dated: March 20 , 2018
      Brooklyn, New York

s/Carol Bagley Amon
_____
Carol Bagley Amon
United States District Judge